178 A.2d 486 (1962)
HARVARD INDUSTRIES, INC., a Delaware corporation, Plaintiff,
v.
Rose N. WENDEL, Natalie Wendel Loeb, Vera Wendel Wolpe, Christine M. Wendel, Francesca M. Wendel, Carl H. Glaeser, Ralph De Garmo, and Eric Jackson, Defendants.
Court of Chancery of Delaware, New Castle.
February 1, 1962.
*487 Clyde M. England, Jr., of Killoran & VanBrunt, Wilmington, and Robert J. Haft and Morton I. Hamburg, of Goldstein, Judd & Gurfein, New York City, for plaintiff.
William Prickett, Sr., of Prickett, Prickett & Tybout, Wilmington and Harold Riegelman, Jacob I. Charney & Richard L. Aronstein of Nordlinger, Riegelman, Benetar & Charney, New York City, for defendants.
SEITZ, Chancellor.
Harvard Industries, Inc. ("plaintiff") brought this action against the individual defendants asserting three claims. Under the first claim plaintiff seeks rescission, damages in the amount of $200,000 and other relief based upon the alleged fraud and misrepresentations practiced primarily by the defendant, Rose Wendel ("defendant" or "Rose"), arising out of a stock purchase agreement and a note agreement made by plaintiff and defendant on behalf of herself and the other defendants. The second claim, in the alternative, is based on alleged breaches of written warranties and representations involved in the same transactions. The third claim, in the alternative, alleges innocent misrepresentations in the same transactions. This is the decision after final hearing.
While several individuals are joined as defendants because of their interest in certain promissory notes and because they owned varying amounts of the stock covered by the stock purchase agreement, it is agreed that the defendant Rose acted for all of them. Thus, the disposition of her rights and liabilities will be deemed to include the rights of other defendants wherever pertinent.
To understand the transactions under attack it is necessary to identify and relate the history of the various corporations whose stock was involved in the purchase agreement.
Rudolf Wendel, Inc., Wendel Artistic Lighting Corporation and Wendel Western, Inc. ("Wendel companies") were corporations founded by the late Rudolf Wendel, an inventor and lighting engineer, to carry out the invention, patenting, design, manufacturing, and selling of distinctive artificial lighting techniques, fixtures, and installations. During World War II and thereafter, the business was expanded to include government optical products and other precision instruments used by the armed forces. Rudolf Wendel's wife, Rose, was active in the business and financial affairs *488 of the Wendel companies from their founding some thirty years ago and became president and controlling stockholder in the companies upon her husband's death in 1955. The manufacturing plant of the companies, originally in Long Island, New York, was moved to Santa Rosa, California, and in recent years employed on the order of 25-45 persons. The business offices remained in New York City.
For many years the Wendel companies were profitable operations and held an excellent reputation and record for performance in both the lighting field and government contract work. During the 1958-59 period under consideration in this litigation, however, it is uncontested that the companies were not profitable and that there would be few, if any, profits from the six government contracts then in progress. Some of the major issues in this action turn on whether or not the financial status of the Wendel companies, particularly as of December 31, 1958, and April 30, 1959, was misrepresented or concealed by defendant in her negotiations with the plaintiff.
In the latter part of 1958, Rose began to seek a buyer for the Wendel companies through a certified public accountant, Mr. Vossler. None of the prospects was sufficiently interested, but early in 1959 the Wendel companies were brought to the attention of plaintiff by Mr. LaRocca, a Chicago business broker.
Plaintiff, with headquarters in Pittsburgh, was engaged in the acquisition and operation of smaller diverse companies and enterprises which it sought to improve under its ownership and coordination. The Wendel companies were part of this plan of growth. The primary negotiators of plaintiff in acquiring the Wendel companies were Mr. A. L. Robinson, Jr. ("Robinson"), president of Harvard, and Mr. J. D. Simpson ("Simpson"), vice-president and treasurer of Harvard.
After a preliminary meeting with defendant and certain associates in the Wendel office in New York, Robinson visited the Wendel plant in Santa Rosa April 6-8, 1959, to obtain further information and to meet key personnel. This visit to the plant was followed by a preliminary oral proposal on April 22, 1959, in New York, from Robinson and Simpson to defendant, which was incorporated later that day into a letter of intent and a separate indemnification letter from Robinson to defendant. Definitive agreements, dated May 22, were later drafted by counsel of both sides to give effect to the letter of intent. The agreement provided that New York law should control.
Meanwhile on April 28, Robinson contacted Mr. Hough ("Hough") whom Robinson had known as comptroller of a concern for which they had both previously worked, to interest him in being manager of the Wendel companies, if acquired. Hough subsequently accepted Robinson's terms of employment and went to the Santa Rosa plant of Wendel on May 18. He had access to all parts of the plant and to plant records and, on his return to Pittsburgh, gave Robinson a favorable report on the Wendel companies. On approximately June 9, Hough took formal charge as general manager and acted in that capacity until the plant was shut down November 20.
There were two agreements dated May 22, 1959, that put into effect the letter of intent of April 22: The "note agreement" and the "stock agreement". The stock agreement was later amended on June 22. The "note agreement" provided that defendant would receive from plaintiff on the closing date, June 22, 1959, $50,000 and a promissory note for $68,661 principal amount in exchange for the promissory notes of the Wendel companies payable to her in the aggregate principal amount of $118,661 and, for the account of other individual creditors of the Wendel companies, an aggregate amount of $28,000 in exchange for the promissory notes of the Wendel companies owed to these other creditors. The note agreement also provided, among other things, that it would be void and unenforceable unless the *489 terms and conditions of the stock agreement of even date were complied with and the contemplated stock transfer accomplished.
The original stock agreement of May 22 provided for an exchange at the June 22 closing date of 50,000 shares of plaintiff's common stock for all of the issued and outstanding capital stock of the three Wendel companies and set forth representations and warranties of the parties as well as conditions to their obligations. The representations and warranties were to survive, with certain exceptions, the closing date by a period of six months. Germane to one of the major issues in this action are the provisions specifying that "the accounting principles consistently applied by the said corporations" were used by the Wendel companies in preparing the financial statements for the years ended December 31, 1956, 1957, 1958 and for the four-month period ended April 30, 1959, and that inventories were valued at the lower of cost or market.
The May 22 agreements were signed by defendant on that date and approved by plaintiff's board of directors and signed by Robinson on June 18. There is conflicting testimony as to whether or not plaintiff's board was informed of the April 22 letter from Robinson to Mrs. Wendel agreeing to indemnify her against loss on her personal guaranty, given in 1956, of repayment of loans from the Franklin National Bank of New York to Rudolf Wendel, Inc., the outstanding obligation of which was $161,386.26 on the June 22 closing date. My decision on defendants' second counterclaim makes it unnecessary to resolve this conflict in the testimony.
On June 19, Mr. Lawlor ("Lawlor") a partner in Miller and Company, certified public accountants in New York City, presented his review of the Wendel companies' financial status to Robinson, Simpson, and Houston, the latter a director and legal counsel of plaintiff. There is conflicting testimony as to whether or not Lawlor recommended that plaintiff should not go through with the transaction. In any event, as a result of his depressing financial review and the fact that Rose had notified plaintiff in May of a $52,000 error in the December 31, 1958, balance sheet, the stock agreement was re-negotiated with defendant and amended.
The amended agreement, dated June 22, reduced the consideration for Wendel stock from 50,000 to 30,000 shares of plaintiff's stock and provided a formula for transferring a maximum of 10,000 additional shares to the Wendel stockholders, depending on the future profits of the Wendel companies. A new section was added to the agreement which limited recourse against defendant Wendel for any breach of warranties to the interest or principal due on the $68,661 note to her from plaintiff, covered in the note agreement of May 22. This amended stock agreement, as well as other necessary attendant transactions, was executed by the parties on June 22. In addition, a new letter agreement, dated June 22, to indemnify Mrs. Wendel against loss on her guaranty of the Franklin National Bank loan was signed by Simpson.
As previously stated, Hough was general manager of the plant from approximately June 9, 1959, until its closing some five months later. There is considerable evidence that both Hough and Robinson were concerned during the months of August, September, and October over the progress of work on the government contracts. Rejects and costs continued at a relatively high level.
Finally in early November, Mr. Tranes ("Tranes") an accountant employed by plaintiff, was sent to Santa Rosa by Robinson and Lawlor to examine in detail the government contracts, bids, and performances, i. e., to perform an audit. His report to Hough, presumably oral, and Hough's subsequent discussions with Robinson and Simpson in New York led to Hough's telephone call November 20, on Robinson's instructions, ordering the Wendel plant closed and all personnel suspended. Plaintiff informed defendant that this action was being *490 taken by a letter dated November 20, but mailed November 24, and notified her that it elected to rescind the agreements and all attendant transactions, alleging misrepresentations and citing particularly the financial statements attached to the stock agreement and the valuation of inventories. Plaintiff then brought this action.
The parties agree that one legal prerequisite to a finding of fraud here is a determination that a material misrepresentation was made. Plaintiff's principal claim of fraud is based on alleged overvaluations placed on the Wendel inventories in the financial statements attached to the stock agreement of May 22, 1959, particularly the balance sheets for the four-month period ended April 30, 1959. Plaintiff concentrates its attack on what it says was the obvious fact that, as to substantial items in the inventory, defendant must have been aware at the contract date that the final total costs would be greater than the sales price of such inventory. Thus, plaintiff invokes the "net realizable value" theory of valuation with the resultant claim that the inventory had a zero value. Before discussing the inventory specifically, it is important to consider the governing terms of the stock purchasing agreement and their application to this complex valuation problem.
The stock agreement contains the following provisions concerning inventory valuation:
Section 2(d): "The financial statements * * * for the years ended December 31, 1956, 1957 and 1958, and the financial statement for the four month period ended April 30, 1959, attached hereto as Exhibits 1 to 4, constitute substantially true and correct statements as of such dates of the financial condition of the Wendel Corporations and of their assets, liabilities and income, prepared in accordance with accounting principles consistently applied by the said corporations * * *."
Section 2(j) (i): "The inventories (excluding tooling, etc., referred to below) of each Wendel Corporation as reflected in Exhibit 4 [attached to PX-1], and as specifically set forth in separate schedules dated as of December 31, 1958, furnished by Wendel to Harvard prior to the execution hereof, are valued at the lower of cost or market, not more than 15% shall be more than two years old on the date of closing and in the usual and ordinary course of business as its operations are now conducted, can reasonably be anticipated to be all consumed or sold within two years thereafter except for 10% classified as `slow-moving'".
Section 2(j) (ii): "The inventory of Wendel Corporations listed on the schedules referred to in (j) (i) above include certain tooling, parts, machinery, etc., and letters patent for a swimming pool lighting device, said letters patent being valued at $20,000 (hereinafter collectively referred to as Tooling Inventory). The Tooling Inventory is in good and usable condition, except for 5% thereof and 85% thereof is either currently in use or in the exercise of good business judgment can reasonably be expected to be used by the Wendel Corporations in the conduct of their business within the next two years after the closing date."
Thus, Section 2(d) required that the statements of assets, liabilities, and income be prepared in accordance with the accounting principles that had been consistently applied in the past by the Wendel corporations and Sections 2(j) (i) and (ii) required that inventories (excluding certain tooling, parts, machinery, etc., and letters patent for a swimming pool lighting device) be valued at the lower of cost or market. Defendants could not fulfill simultaneously, therefore, the requirements of these provisions unless the Wendell corporations had consistently used the valuation method for inventories, other than tooling, of the lower of cost or market.
*491 It appears, on examining the income statements for the corporations for the years 1956, 1957, 1958, and for the four-month period ended April 30, 1959, that the consolidated statements consistently showed significant annual losses while inventory valuations were always high and actually continued to increase from year to year. The first impression one gets from such data is that the Wendel corporations as a group were operating unprofitably and that a major portion of their assets was in inventories. Indeed, plaintiff's agents were well aware of the financial plight of the companies when they negotiated the agreements here involved.
To resolve plaintiff's contention concerning the applicability of its "net realizable value" theory to the inventory item, it is necessary first to consider certain accounting principles. As is well known, accounting is usually based on cost. The Restatement and Revision of Accounting Research Bulletins issued by the Committee on Accounting Procedure of the American Institute of Accountants, on which plaintiff places considerable reliance, sets forth the general principle regarding inventory valuation as follows:
Chapter 4, "Inventory Pricing, Statement 3: The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location."
The Discussion following Statement 3 elaborates:
"5. In keeping with the principle that accounting is primarily based on cost, there is a presumption that inventories should be stated at cost. The definition of cost as applied to inventories is understood to mean acquisition and production cost, and its determination involves many problems * * *. The exercise of judgment in an individual situation involves a consideration of the adequacy of the procedures of the cost accounting system in use, the soundness of the principles thereof, and their consistent application."
Therefore, plaintiff, whose representatives, Hough, Simpson, and Lawlor were thoroughly familiar with accounting, could reasonably have expected inventories to be stated at cost unless there were compelling reasons to do otherwise.
Statement 5 provides:
"A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost * * *. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market."

Statement 6 further provides:
"As used in the phrase lower of cost or market the term market means current replacement cost (by purchase or by reproduction, as the case may be) except that: (1) Market should not exceed the net realizable value (i. e., estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal * * *".
It is apparent at the outset that difficulties arise in valuing inventory at the lower of cost or market, particularly in the case of partially completed work. Unconverted raw materials are valued at either the actual cost to acquire them or what they would now cost or sell for on the open market, whichever is lower. Finished goods *492 are valued at manufacturing cost or at the contract selling price, whichever is lower. Thus, the valuation of raw materials and finished goods is relatively straightforward.
The application of the valuation method of lower of cost or market to work in process involves, first, an estimate of the cost of work remaining to be done on a given article in order to estimate if the final total cost of the finished article exceeds its sale price. If it does not, the cost basis of valuation is used. If it does, net realizable value may be used. In cases where a total of only several hundred or several thousand units are made, such as in the government contracts involved in this litigation, the unit costs are usually much higher at the beginning than at the end of the contract performance period because of the initial start-up costs and manufacturing inefficiencies inherent in getting such operations underway. These cases are to be distinguished from those where articles have been produced in such quantity and for such periods of time that costs have stabilized and it is possible to estimate unit costs at various stages of production with considerable accuracy. It is to be expected, therefore, that estimates of costs of completion of the government contracts involved here are inexact, speculative, and subject to controversy, and that, when in doubt, the usual, as well as the most convenient, accounting approach to valuation of work in process is to use an actual cost basis. Furthermore, it is questionable whether a switch in valuation method from cost basis to market basis should be made near the beginning of contract performance even though it can be estimated with fair accuracy that the units then being made will cost more than the unit sales price; it is possible that later units will be made at costs lower than the unit sales price. This is the purport of the Discussion under Statement 6:
"10. Because of the many variations of circumstances encountered in inventory pricing, Statement 6 is intended as a guide rather than a literal rule. It should be applied realistically in the light of the objectives expressed in this chapter and with due regard to the form, content, and composition of the inventory * * * It [the Committee] also recognizes that, if a business is expected to lose money for a sustained period, the inventory should not be written down to offset a loss inherent in the subsequent operations."
It is manifest that there will be an overall loss on a contract when total contract costs already equal or exceed the total contract sales price and there are still units to be finished to fulfill the contract. In this situation, the use of net realizable value may be necessary to reflect realistically the true value of the work in process. Even then, however, the use of net realizable value is subject to interpretation. Plaintiff urges that all of the inventory in this situation should have only zero value by applying its interpretation of the net realizable value method. Another interpretation is to deduct from unit sales price the overall average unit share of total estimated contract loss and to use this resultant average value of a finished unit together with the applicable finishing cost of each partially finished unit to estimate the net realizable value of each partially finished unit and, by summation of the values of all the partially finished units, the total market value of work in process. This interpretation has the advantages of assigning the same reasonable value to each finished unit, rather than different values during the course of contract performance, and of not inevitably obtaining an unrealistic zero value for work-in-process inventory whenever total contract cost equals or exceeds total sales price.
Still another interpretation is to compare the summation of actual unit cost incurred to date and estimated unit cost to complete with unit sales price for only the specific unfinished units on hand at inventory date without regard to whether or not total contract cost to date is reasonable relative to total sales price. Here, the only relevance of the unit costs of prior finished units is whatever aid these costs might provide to *493 the estimation of costs to complete of the current unfinished units, and the comparison of total contract cost to date with total sales price is otherwise irrelevant to the valuation of work in process.
Obviously, any interpretation of the use of net realizable value involves making estimates of costs of completion which are subject to debate, but it is clear that plaintiff's interpretation is not the only one and may not be the best one for valuation of work in process. It is also clear that the accuracy of estimates of overall contract profitability or loss, made when work has just begun on a contract, is little, if any, better than that of the original contract bid, unless there has been a conscious decision purposely to underbid or overbid on the contract.
As a further reason for not using plaintiff's interpretation of net realizable value in the valuation of work in process here, the re-negotiation of contract price to offset probable losses would have had the effect of switching any work-in-process inventory valuation at net realizable value back to a cost basis again. Furthermore, the undesirable effect of using plaintiff's interpretation is to afford it the full benefit of the losses (as reflected in the net values of the companies) when it determined the value to be paid for defendants' stock and at the same time permit it to employ such losses as a partial basis for concluding that existing inventories were overvalued.
I turn now to the specific items under attack.
Plaintiff has not proved that the total inventory figure of $18,529 at April 30, 1959, advanced by defendants for the binocular contract, is wrong. Plaintiff's figure of inventory cost of $12,753 contains both proven and probable errors and does not include any tooling inventory. In regard to the assertion that this was a "loss contract", only approximateely $26,000 had been spent by April 30, 1959, compared to the original sales price of $197,470.00, and there is no justification for using anything other than a cost basis for valuation of work-in-process at that early stage of manufacture.
There were conflicting estimates as to whether or not the binocular agreement was a "loss contract". Thus, defendants' "blue sheets" (which contained estimates of cost to complete made before negotiations with plaintiff) and the testimony of defendant Wendel, Vossler, an accountant who had made efforts to sell the Wendel companies, Hearn, the Wendel optical engineer, and others merely demonstrate the great difficulties involved in estimating costs of work remaining to be done on these contracts. Thus, plaintiff's prepared bid on a new binocular contract in September 1959 was only 25% greater in unit price than the bid of Rudolf Wendel, Inc. made in early 1958, even though plaintiff's later bid was for fewer units and included substantial allowances for contingencies and profit and a higher overhead rate. The "blue sheets", mentioned above, although possibly unduly optimistic, cannot be construed as misrepresentations pertinent to inventory valuation. Furthermore, they were not relied on by Robinson or Simpson, and Hough testified that he did not see them until some time during the period of his second visit to Santa Rosa, from about June 8 to July 1.
The M5 Thruster inventory for April 30, 1959, was represented to be $25,404.24 for materials and parts and $12,200 for tooling. Plaintiff urges a zero value for the total inventory. The tooling is not subject to the lower of cost or market valuation. Plaintiff has not differentiated among raw materials, work-in-process, and finished goods in the materials inventory; obviously, unconverted raw materials would not have a zero value by any method of valuation. The tooling inventory cannot be said to have zero value because it was hoped to be used again in cost-plus contracts. Plaintiff implies that the tooling was consumed in the process, but it has not proved this even though the contract was completed in September 1959 under its control. According to plaintiff's figures, this contract, which had an original sales price of $70,720.54, cost a total of *494 $143,421.09 to complete, indicating an overall loss of $72,700.55. Plaintiff argues that it should have been clear to defendants on April 30, 1959, that total costs had already exceeded the sales price. Nevertheless, as indicated above, plaintiff has not shown that the materials inventory was overstated or that defendants' valuation of tooling was wrong.
The Alidade contract inventory of April 30, 1959, was represented by defendants to be $19,117.80 for materials and parts and $10,416.76 for tooling. Plaintiff argues that the inventory value of materials should have been zero, because the contract, which had a sales price of $82,044.00, had incurred costs of $108,567.92 up to April 30, 1959. This contract was eventually completed at a total cost of $116,282.84, indicating an over-all loss on the contract of $34,238.84. Here again, however, plaintiff does not differentiate among raw materials, work-in-process, and finished goods in applying its definition of market. Plaintiff argues that the tooling inventory value was zero because it would never be used again due to the lack of profitability of such contracts. The best answer to this assertion is that the tooling was usable on a new Alidade contract obtained by plaintiff on August 24, 1959, as well as on another proposed bid outstanding at the time the plant was shut down.
The M3 Thruster inventory of April 30, 1959, was represented by defendants to be $26,861.67 for materials and parts and $11,700.00 for tooling. Plaintiff's figures show that this $120,413.62 contract had incurred total costs of $61,463.94 as of April 30, 1959. Plaintiff maintains that the contract could be expected to be a loss contract since something less than 30% of the work had been completed on April 30, 1959 and that the materials inventory should, therefore, be valued at zero. Plaintiff also maintains that tooling inventory should have zero valuation because it could not be expected to be used again in such costly contracts. The answer to these assertions is that defendants' contracted sales price in January 1958 of $58.75 per unit was higher than the price paid by the Government two years later on two occasions to other contractors. Thus, defendants' price was not unreasonably low, and it cannot be concluded that this was necessarily a loss contract. Even if it had been shown that a contract loss was inevitable and that work-in-process should be valued pursuant to plaintiff's interpretation of net realizable value, plaintiff's argument fails for lack of distinction among the categories of inventory.
Plaintiff also attacks the values placed on various other inventory items. As to the M86 Telescope tooling, plaintiff relies on hearsay testimony that Hearn, the optical engineer, valued it at $603 whereas it is shown in the inventory at $7,500. Hearn's testimony refuted this assertion. The fact that Hirschberg, a Wendel officer and defendant's brother, paid only $30 in outbidding a junkdealer for this tooling merely indicates that, in the forced sale of this specialized equipment as surplus by the New York Ordinance District, it had essentially no utility to anyone else except Rudolf Wendel, Inc., which could reuse it in its business. Its utility to the corporation could be assessed only by Wendel personnel.
Similarly, the M-12 tooling, the various optical and physical test equipment, and the miscellaneous tooling inventory items were established by the testimony of DeGarmo, manager of Rudolf Wendel, Inc., Hall, the purchasing agent, and Hearn to have greater utility and value than that assessed by Tranes. The T-159 production tooling and gages had utility in the T-159 E-1 modification contract and would have had further use if anticipated re-orders were made.
Plaintiff next claims that the values placed on the inventories of lighting materials at Santa Rosa and Long Island, New York, and on the swimming pool lighting patents were overstated by defendants. The valuations of these non-Government inventories are attacked primarily because they allegedly substantially exceeded the permissible percentages of obsolete and slow-moving *495 items as contained in Sections 2(j) (i) and 2(j) (ii) of the stock agreement.
The value of the lighting inventory of Rudolf Wendel, Inc., was represented by defendants to be $55,775.66 as of April 30, 1959. Plaintiff's figures, alleged to be based on information obtained from DeGarmo in October and November, 1959, indicate that $17,250.18 of this inventory item was either obsolete or in excess supply. DeGarmo, however, testified that these figures did not represent his judgment as to obsolescence and excess supply. Furthermore, there is evidence that most items of this inventory, including some claimed by plaintiff to be obsolete or in excess supply, were in active demand after April 30, 1959.
The total inventory of Wendel Artistic Lighting Corporation was valued by defendants at $30,700 as of April 30, 1959. Plaintiff relies here on an inventory valuation as of August 31, 1959, by Salerno, an employee of the Miller accounting firm, to arrive at the figure of $6,551 as the portion of this inventory which it claims was obsolete or slow-moving. It is clear from Salerno's testimony, however, that he did not know how the figure was arrived at or whether the Wendel employees aiding him used the same definition of "obsolete" or "slow-moving" as Section 2(j) (i). In any event, when the value of expendable tooling is added to Salerno's figures, the resultant total inventory value as of August 31 is within $260 of defendants' representation of $30,700 as of April 30.
The total inventory of Wendel Western, Inc., was valued by defendants at $30,170 as of April 30, 1959, $20,000 of which was represented to be the value of letters patent for a swimming pool lighting device. Plaintiff assigned a value of $1.00 to the patents because one patent would expire in 1961 and the other in 1966 and because Hough testified that Glaeser, manager of Wendel Artistic Lighting Corporation, told him that no future sales were in prospect.
Passing over any issue as to the admissibility of any of this evidence, the possible use of these patents was of course uncertain. At least eight swimming pool lighting installations had been made in the past. Mrs. Wendel testified that the $20,000 value was based on the expectations of Jackson and DeGarmo, managers of Wendel Western, as to the number of units of swimming pool lighting they could sell in the future. Thus, it would seem that defendants' valuation of the patents comes within the provisions of Section 2(j) (ii) of the stock agreement allowing for an estimate of future use of Tooling Inventory, including the patents, based upon "the exercise of good business judgment".
I therefore conclude from the evidence that the lighting inventories at Santa Rosa and Long Island, New York, were not overstated by defendants. Indeed, plaintiff has not shown that the valuation of such inventories was not in accordance with Section 2(j) (i) of the stock agreement and that the valuation placed on the swimming pool lighting patents was not in accordance with Section 2(j) (ii).
Plaintiff next contends that the accounts receivable item as of April 30, 1959 was overstated. The stock agreement in Paragraph 2(k) provides, in brief, that such accounts, as reflected in Exhibit 4 attached to the stock agreement and earlier schedules of the Wendel corporations, would be reasonably anticipated to be collectible within 120 days after the closing date or the due date, whichever is later, except 5% thereof and except the contract between Wendel Western, Inc., and Mr. Pignatari.
Specifically, plaintiff attacks the placing under "Accounts Receivable" of the balance of the progress payment in the amount of $7,967.74 due from the Government on the Pilot Model Binocular and the amount of $15,842.03 requested for extra Government-instigated costs on the M-3. Defendants state, and the court agrees, that the treatment of those items was consistent with the accounting policy of the Wendel corporations. Even if the treatment employed was not "good" accounting practice *496 the anwer is that the agreement of the parties imposed a different standard here. It is clear that plaintiff knew of this policy as evidenced by Lawlor's report to Robinson, Simpson, and Houston on June 19. Also, these amounts were not repeated in the inventory valuation. The fact that the Pilot Model Binocular had not been shipped as of April 30, 1959, is irrelevant because of the governing accounting policy. In addition, defendants never maintained that it had been.
Turning next to accounts payable, plaintiff claims that this item was understated in the amount of $4,889.72. The amount of the claimed understatement arose from certain creditors' bills alleged to have been due at April 30, 1959, and not reported by defendants in the accounts payable for the January-April 1959 period, although covered by invoices allegedly dated on or before April 30, 1959.
Defendants represented that the current liability of accounts payable of Rudolf Wendel, Inc., as of April 30, 1959, was $44,729.85. Tranes testified for plaintiff that his audit for the period January 1-April 30, 1959, showed the understatement. He also testified that he might have included some invoices which could have been attributable to and included in the period before the January 1-April 30 period, but that he had not verified whether or not this was so. In such circumstances and in view of the relatively small amount at issue, it is impossible to conclude that a significant understatement was made.
In summary, I conclude that defendants did not make either fraudulent or innocent misrepresentations in their financial statements attached to the stock agreement and that they did not breach the warranties made in the agreements.
As a second and independent ground I conclude that plaintiff's agents did not in fact rely on what they erroneously claim to have been misrepresentations. Thus, plaintiff was sufficiently informed of the policies and practices involved in the financial statements of the Wendel corporations before the amended agreement was signed. This is evidenced by the Lawlor report of June 19, the discussions Lawlor and Tranes had with Gottdiener, an accountant in the accounting firm employed by the Wendel companies, on June 12, and Hough's access to the Santa Rosa files and records beginning approximately May 18. The record is replete with references to the poor financial status of the Wendel corporations, taken as a whole, at the closing date of the stock agreement and to the necessity of quickly providing additional working capital and production management to make them a success. The fact that plaintiff did not or could not provide these essentials for success of the Wendel corporations is not defendants' fault. Finally, it is clear to me that in revising downward the consideration to be paid for the stock, plaintiff's agents relied in substantial part on many of the facts which they now rely upon to charge misrepresentation.
Plaintiff has no right, therefore, to either rescission of the stock and note agreements or damages on any of the three grounds asserted.
I now turn to the counterclaims asserted by defendants against plaintiff. These counterclaims involve the promissory note of plaintiff to defendant Wendel, the agreement to substitute plaintiff as guarantor and to indemnify defendant Wendel on her personal guaranty of the Franklin National Bank loan to Rudolf Wendel, Inc., the defendants' right to an additional 10,000 shares of Harvard common stock, and libel and slander of defendant Wendel. With the exception of the claim for the additional 10,000 shares of Harvard stock, Mrs. Wendel is the sole claimant in these counterclaims.

I. PROMISSORY NOTE OF PLAINTIFF TO DEFENDANT WENDEL
As part of the over-all transaction plaintiff gave Mrs. Wendel $50,000 in cash and *497 its promissory note for $68,661 principal amount in exchange for the promissory notes of Rudolf Wendel, Inc., payable to her in the total amount of $118,661 principal. Plaintiff defaulted in payment of the first interest payment, due December 31, 1959, and the entire principal amount, as well as interest, then became due and payable. Since January 1, 1960, interest has accrued at 6% per annum on the total of $70,274.51 principal and interest that was due on that date.
In accordance with my conclusion that plaintiff did not prove misrepresentations or breach of warranties on the part of defendants, plaintiff is fully liable, without any offset, for the total principal and interest now due on its note to defendant Wendel.

II. BANK GUARANTY SUBSTITUTION
Defendant Wendel gave her personal guaranty February 20, 1956 of the outstanding loans made by the Franklin National Bank of New York ("Bank") to Rudolf Wendel, Inc. She is now being sued by the Bank, as co-defendant with Rudolf Wendel, Inc., for the sum outstanding plus interest, attorneys' fees, and costs as a result of default in payments on the loans after the Wendel corporations were closed. The outstanding obligation to the Bank was $161,386.26 on June 22, 1959 and $194,094.97, plus interest, on November 20, 1959; during the interim, Hough, acting for plaintiff and without defendant Wendel's knowledge, borrowed an additional $43,000.
Defendant Wendel's second counterclaim in this action seeks specific performance of plaintiff's agreement to substitute itself for defendant and to indemnify her on her guaranty to the Bank, on the basis of the indemnification and guaranty substitution letter agreements to her, one executed by Robinson, dated April 22, 1959 and the other executed by Simpson, in Robinson's presence and with his approval, dated June 22, 1959.
The April 22 letter provided that plaintiff would assume the Bank guaranty and, in effect, indemnify defendant Wendel, if she had not been successful by closing date of the stock purchase agreement in terminating her guaranty with the Bank. The June 22 letter agreed to indemnify defendant Wendel and obligated plaintiff to arrange the termination of her guaranty.
Simpson and one of defendant Wendel's attorneys, Lorch, visited the Bank on July 21, 1959 to attempt to substitute plaintiff for defendant Wendel, but did not succeed because they lacked up-to-date financial data on Harvard. The requested information was not furnished later. Prosswimmer, then executive vice-president of the Bank, testified that the substitution would have been made if more current information on Harvard had been furnished. It is clear that Robinson knew of this attempt to effect a substitution.
Plaintiff argues that neither of these letter agreements was authorized by the Harvard Board of Directors and that Robinson and Simpson had neither actual nor apparent authority to agree to assume the guaranty. The matter is not explicitly referred to in the minutes of the Harvard board meeting of June 18, 1959 and is not mentioned in the stock and note agreements, nor in the certified resolutions of the board, nor in the opinions of Houston's law firm on the agreements, delivered by plaintiff to defendants at the sale closing date. There is conflicting testimony as to whether the substitution question was discussed at the June 18 board meeting. It was, however, discussed at the conferences held between the parties on June 19 and June 22.
The reason for the treatment of the Bank guaranty substitution separately from the other transactions can be traced to several causes. First, it was hoped in the beginning that defendant Wendel alone could arrange the termination of her guaranty before closing date. When this was not done, everyone thought up until the last minute on June 22 that a telephone call *498 from Simpson to the Bank would be sufficient to arrange the substitution, but the telephone connections were not made. Therefore, right up to closing time, the parties thought that the substitution would be an accomplished fact before the final closing, and, hence, would not require any formal arrangements at that time. There also seems to have been a tax reason for keeping the Bank guaranty substitution agreement completely separate from the stock purchase and note agreements. Finally, the seriousness of the matter was not fully realized at that time, because it was expected, at least by Robinson, Simpson and Houston that the Wendel corporations would become successful operations and that the loan would be repaid out of profits.
There is, however, no such clear and uncontroverted explanation as to why Robinson's letter of April 22 to defendant Wendel was not discussed at the June 18 board meeting and not explicitly mentioned in the minutes of that meeting. Robinson and Houston claimed it was not discussed. Simpson testified that it was. Apparently, no one thought that it was of sufficient moment to warrant making an issue of it at the time. The prevailing feeling of Robinson and Simpson seems to have been that the guaranty substitution would be accomplished before closing without any need for board action.
Defendants argue that, in any event, the catch-all board resolution authorizing the proper officers "to perform such other and further acts as may be necessary or desirable to make the foregoing resolutions fully effective" is broad enough to include the bank guaranty substitution and that, furthermore, plaintiff's then existing bylaws support a finding of authority on the part of either Robinson or Simpson to make the agreement. These by-laws were amended by plaintiff's board of directors on February 24, 1960, by a statement that future guaranties of loans or credits to be made on behalf of its divisions or subsidiaries be discussed and approved in advance by the board. Plaintiff maintains, however, that the change in by-laws is irrelevant on the narrow ground that it applies only to existing subsidiaries and not to prospective subsidiaries, but it overlooks the fact that the Wendel corporations became subsidiaries at the time of the June 22 letter agreement and that the by-law change would prevent a recurrence of such on-the-spot contracts.
As evidence of the broad powers of Robinson and Simpson, neither Robinson, Simpson, nor Houston ever felt the need to resubmit the amended stock agreement, prepared by Houston's firm after June 18, to the board for approval although it contained a new section limiting plaintiff's recourse for any breach of warranty to the promissory note given defendant Wendel and although Lawlor had made on June 19 an unfavorable report on the condition of the Wendel corporations.
It was a major part of the "ordinary" and "regular" business of plaintiff to seek out and acquire other manufacturing companies. During the 1959 period before August 15, plaintiff acquired a number of companies in addition to the Wendel corporations. In several instances plaintiff guaranteed the indebtedness of the new acquisition as a normal incident of the transaction.
I conclude, therefore, that both Robinson and Simpson as plaintiff's agents were empowered by the board of directors to enter into the June 22 letter agreement, so as to make the agreement binding on plaintiff corporation. In the light of plaintiff's program of corporate acquisitions, its officers were justified in assuming that the resolution of the Harvard board, referred to above, authorized them to attend to all necessary incidents of the acquisition of the Wendel corporations. In any event, defendants were entitled to rely on the apparent authority of plaintiff's agents because the transaction was in implementation of its known business acquisition policy. *499 Plaintiff may elect either to pay the Bank directly or to cause itself to be substituted on defendants' guaranty.

III. DEFENDANTS' RIGHT TO AN ADDITIONAL 10,000 SHARES OF HARVARD STOCK
The amended stock agreement of June 22 provided for the delivery to defendants, as further consideration, of a maximum of 10,000 additional shares of Harvard common stock in accordance with a formula set forth in Section 12 of the agreement as amended. In brief, the formula provided that beginning in the last six months of 1959 and for each calendar year thereafter a dollar amount equal to 50% of the consolidated net income of the Wendel corporations would be translated into Harvard shares, valued for this purpose at a fixed value of $5.00 per share, and these shares delivered to defendants. This process was to continue until the prescribed maximum of 10,000 shares was reached.
Defendants maintain that plaintiff repudiated the contract when it shut down the Wendel corporations on November 20, 1959, and that they are, therefore, entitled to the value of the contract, i. e., the 10,000 additional shares of Harvard stock, citing Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 4 N.E. 264. They argue that they had a right certain to the additional shares and that the only uncertainty was as to the delivery time of these shares. This case is not controlling here because it dealt with the measure of damages following an admitted breach, whereas here the crucial issue is whether there was a breach.
Under the terms of the agreement, defendants were entitled to additional shares when the stipulated profits were realized from the operation of the Wendel corporations. The agreement did not contain any explicit provision which required the plaintiff to continue to operate the Wendel companies. Under such circumstances, will the court imply any obligation on plaintiff's part to continue such operations? For purposes of this case, I assume that plaintiff had an obligation to continue the business. I am satisfied, however, that any such obligation was subject to a good faith determination that the operations could be terminated for legitimate business reasons. Compare Dickey v. Philadelphia Minit-Man Corp., 377 Pa. 549, 105 A.2d 580. I say this because plaintiff was not required to operate the companies indefinitely at a loss simply to prove that defendants would not receive additional shares.
It was plaintiff's decision, made from a business viewpoint after several months' experience in attempting to improve operations, that caused the plant to be closed. It is uncertain, of course, whether or not the Wendel corporations would have become profitable even if all of defendants' recommendations for improving performance had been carried out. It is clear that the corporations, as a group, had not been profitable under defendants' management since 1955. The time and money required to make them profitable again may very well have exceeded the resources of plaintiff reasonably available for this project.
Money for the Wendel corporations was needed immediately as evidenced by the numerous references in the record to the need for working capital during the summer and fall of 1959. Rose testified that she estimated to Robinson during negotiations for the sale that more than $100,000 additional working capital was needed for operation of the companies. Simpson testified that he agreed with the shut-down because of the great amount of cash that would have been required for continued operation. He estimated that $400,000 to $500,000 was needed to continue. According to Robinson's testimony, Harvard advanced $70,000 to the Wendel companies between May 20 and November 20, 1959. Whatever the situation may have been immediately after the acquisition, I am satisfied that by November 20 the need of the Wendel companies for working capital was of sufficient magnitude and acuteness to warrant a review by plaintiff's executives *500 of the wisdom of continuing such operations.
One of the reasons for plaintiff's lack of cash was its depletion in the acquisition of other companies after the Wendel purchase. The subsequent need early in 1960 to sell some of the recently acquired companies is further evidence, although circumstantial, of plaintiff's financial difficulties at the time of the closing of the Wendel plant.
Although I have found that there was no misrepresentation, it is clear that the demands of the former Wendel companies upon plaintiff for additional capital were grossly disproportionate to the companies' reasonable expectations of future profitable operations. Plaintiff's obligations to its shareholders demanded that the decision to close the plant be made if its officers determined that such was the best course of action in the exercise of good business judgment. Defendants shared with plaintiff, to the degree of their interest in future additional shares, the risks and fortunes of the Wendel corporations. Whether or not plaintiff managed the corporations in the best possible way is not the point; defendants' hopes of further compensation rested on plaintiff's business judgment and performance. Defendants cannot now complain that their faith was misplaced and demand compensation on the basis of profits that were never a reasonable certainty.
I believe plaintiff's decision to terminate the business was based on a good faith determination that the companies could not be operated profitably, at least within the limitations of plaintiff's resources. It is true that this decision was made at the time plaintiff sought to rescind the agreement but this does not alter the fact that a reasonable basis existed for the decision apart from any question of rescission.
I conclude that defendants' counterclaim seeking a recovery in connection with the so-called additional 10,000 shares of Harvard should be denied.
Defendant's Fourth Counterclaim is based on certain allegedly slanderous remarks uttered by an agent of the plaintiff against the defendant, Rose Wendel. Plaintiff's agent is alleged, in substance, to have stated to third parties on several occasions that the defendant made misrepresentations with respect to the Wendel companies.
In the Fifth Counterclaim defendant charges both slander and libel. The slander charge is based on the allegation that plaintiff's agent stated to others that defendant sold shares of Harvard stock, implying thereby that she committed a crime under the provisions of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. Defendant charges that plaintiff's agent libeled her by statements contained in the letter of rescission which plaintiff's agent dictated to his secretary and had mailed to defendant.
Plaintiff has not raised any jurisdictional question with respect to the Fourth or Fifth Counterclaims but the court has raised the issue on its own motion because jurisdiction over the subject matter is involved. Clearly neither of these claims could have been filed in Chancery as a matter of original jurisdiction. While the transaction involved in the original complaint motivated the alleged slander and libel, it seems reasonably clear that the relief sought is not in any sense ancillary to the main action. Thus, it is not covered by the rule permitting a court of equity to decide a legal claim in order to resolve the entire controversy. These claims are therefore not covered by the compulsory counterclaim rule of court.
Because the determinations of these claims are not within the scope of the court's ancillary power to dispose of matters related to those asserted in the complaint, they must be supported by their own basis of equity jurisdiction. Compare Story's Equity Pleadings (3rd ed.), § 398; 1 Whitehouse, Equity Practice, § 142. Since this basis is lacking as to both the Fourth and Fifth Counterclaims, it seems to the court *501 that there is no jurisdiction to dispose of these claims on the merits. The enactment of the "new" rules of court did not enlarge the court's jurisdiction. The first three counterclaims, in contrast, were considered as proceedings necessary to a complete determination of the matter already in litigation. Compare Story, above, § 399.
Since the jurisdictional question was raised by the court on its own motion and since the parties may want to have the court reconsider its ruling, they may apply therefor. If it is not to be reconsidered the court will entertain an application under the Transfer Statute, if desired.
Present order on notice.